UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | | |
|---|---|---|
| Anthony Dickerson, | ) | Civil Action No.: 9:25-cv-13939-DCN |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | COMPLAINT |
| | ) | |
| Austin Capital Bank SSB, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

1. This is an action brought by Plaintiff, Anthony Dickerson, for actual, statutory and punitive damages, attorneys' fees, and costs for Defendant's violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq, (hereinafter "FCRA").

2. The FCRA exists to protect consumers' privacy and to impose upon those who trade in consumers' private information strict requirements to ensure that the information they report is as accurate as possible.

3. Before the enactment of the FCRA, inaccurate and misleading information was identified as "the most serious problem in the credit reporting industry." 115 Cong. Rec. 2411 (Jan. 31, 1969). With this problem in mind, Congress enacted the FCRA "to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report." S. Rep. No. 91-517 (1969).

4. To accomplish Congress' goals, the FCRA contains a variety of requirements to protect consumers, including §§ 1681s-2(b), which is a cornerstone provision of the FCRA.

1

5. One of the primary purposes of the FCRA is to assure "maximum possible accuracy" of consumer information to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

6. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed* (emphasis added).

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)].

## JURISDICTION AND VENUE

7. This Court has Jurisdiction under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681p, and 28 U.S.C. §1331.

8. Venue is proper in the Beaufort Division because the Plaintiff resides in Beaufort County, and the Defendant transacted business in this division.

## PARTIES

9.  Plaintiff, Anthony Dickerson, is a resident and citizen of the State of South Carolina, Beaufort County, and is over the age of twenty-one (21) years. Plaintiff is a consumer as that term is defined by the FCRA, 15 U.S.C. §1681a(c).

10. Defendant Austin Capital Bank SSB ("Austin Capital") is a Bank headquartered in Texas that may be served by way of process through its Bank President, Mark Debiasio, at its corporate headquarters located at 3305 Steck Avenue, Suite 275, Austin, Texas 78757. Defendant was in all respects and at all times relevant herein doing business in the state of South Carolina.

11. Austin Capital is a furnisher of information to multiple Consumer Reporting Agencies ("CRAs"), including Equifax, Experian, and TransUnion, in that it regularly reports account data on consumer credit cards.

## FACTUAL ALLEGATIONS

12. Plaintiff is the owner and operator of a funeral home which provides custom funeral services in the counties of Beaufort and Jasper.

13. In late 2023, Plaintiff discovered an unauthorized payment to Credit Strong on his bank statements. Plaintiff had no knowledge about Credit Strong and did not make this payment.

14. Thereafter, Plaintiff contacted Credit Strong directly and was informed by a representative that a line of credit in the amount of $2,500.00 had been opened in his name.

15. As Plaintiff did not apply for or open this line of credit, Plaintiff immediately instructed his bank to stop all payments to Credit Strong.

3

16. After doing some research, Plaintiff learned that Credit Strong was a division of Austin Capital. Accordingly, Plaintiff contacted Defendant directly and explained that a Credit Strong account had been opened in his name without his knowledge or permission.

17. On or about January 5, 2024, Plaintiff received a letter from Defendant's Operations Manager, Katy Moreno, explaining that Credit Strong is an online program offered through Austin Capital to help consumers build credit by providing credit builder accounts to customers. The letter went on to state that the "Build $2,500" loan opened in Plaintiff's name was a 120-month term loan, and that the account was opened online and electronically signed on October 8, 2022. The letter also stated that only three payments had been made on the loan and that the loan was closed on July 27, 2023. Finally, Plaintiff was told to forward Defendant a copy of any FTC identity theft report and/or police report he filed.

18. On January 23, 2024, Defendant's employee, Jennifer Roberts, responded to Plaintiff's dispute to Equifax claiming this was a fraudulent account by verifying the Account as accurate.

19. On or about April 15, 2024, Plaintiff reviewed his TransUnion, Equifax, and Experian credit reports and discovered several fraudulent accounts were reporting as belonging to him. Specifically, Austin Capital Bank, Account No. 8A6189**** (hereinafter the "Account"), which Plaintiff never opened or authorized, was reporting as a derogatory account on all three of Plaintiff's credit reports.

20. On or about May 17, 2024, Plaintiff filed an FTC Identity Theft Affidavit.

21. On or about May 17, 2024, Plaintiff also filed a complaint with the Consumer

Financial Protection Bureau (hereinafter "CFPB"), wherein he stated he had reviewed his credit reports and found several fraudulent accounts opened in his name. Plaintiff informed the CFPB that he was upset and distressed by the discovery he had been the victim of identity theft because he was currently applying for credit and needed his reports to be correct. With his complaint, Plaintiff attached a copy of his FTC Affidavit.

22. On or about June 22, 2024, TransUnion responded to Plaintiff's complaint through the CFPB. In that response, TransUnion informed Plaintiff that it had forwarded a copy of its Investigation Results to him through the US mail. TransUnion also informed Plaintiff that it was not able to block the fraudulent Account being reported on his credit report, because Defendant had verified the Account as accurate.

23. On or about June 25, 2024, Equifax responded to the Plaintiff's complaint through the CFPB. In that response, Equifax informed Plaintiff the disputed Account remained.

24. In July 2024, in an effort to get the fraudulent Account removed from his credit reports as quickly as possible, Plaintiff hired Credit Beast, a credit repair service.

25. On or about July 12, 2024, with the help of Credit Beast, three dispute letters were sent to TransUnion disputing the Account. Upon receipt of Plaintiff's disputes, TransUnion forwarded same to Defendant for investigation.

26. On or about July 12, 2024, through Credit Beast, three dispute letters were sent to Equifax disputing the Account. Upon receipt of Plaintiff's disputes, Equifax forwarded same to Defendant for investigation.

27. On or about July 12, 2024, through Credit Beast, two dispute letters were sent to Experian. One letter provided the name and address that should be reporting on his credit

5

report, and the second letter disputed the Account. Upon receipt of Plaintiff's disputes, Experian forwarded same to Defendant for investigation.

28.     On or about July 15, 2024, Experian provided its response to Plaintiff's dispute to the CFPB, wherein Experian stated it had contacted Defendant, the furnisher of the disputed Account, and asked them to verify the accuracy of the information. Because Defendant verified the Account as accurate, the Account continued to be reported on the Plaintiff's Experian credit report.

29.     In August 2024, Plaintiff called Defendant a second time and again specifically informed Defendant that the Account was a fraudulent account opened in his name without his knowledge or permission. During this call, Defendant informed Plaintiff he needed to provide them with a police report for his name to be removed from the Account.

30.     On or about August 28, 2024, Plaintiff filed a police report with the Beaufort County Sheriff's Department.

31.     On or about August 30, 2024, Plaintiff file a second complaint against TransUnion with the CFPB, requesting that the Account be deleted from his credit report. Upon receipt of Plaintiff's dispute, TransUnion forwarded same to Defendant.

32.     On or about August 30, 2024, Plaintiff also filed a second complaint against Equifax with the CFPB, requesting that the Account be deleted from his credit report. Upon receipt of Plaintiff's dispute, Equifax forwarded same to Defendant.

33.     On or about August 30, 2024, Plaintiff filed a second complaint against Experian with the CFPB, requesting that the Account be deleted from his credit report. Upon receipt of Plaintiff's dispute, Experian forwarded same to Defendant.

34. On or about September 4, 2024, Plaintiff sent Defendant a copy of his police report and driver's license via certified mail, which was received by Defendant on September 9, 2024.

35. On or about September 10, 2024, Plaintiff filed a second FTC Fraud Affidavit.

36. On September 30, 2024, Defendant's employee, Daniel LoBiondo, responded to Plaintiff's dispute to Equifax claiming this was a fraudulent account by verifying consumer information.

37. On or about September 12, 2024, Experian responded to the CFPB that its response to Plaintiff's dispute was "in progress."

38. On or about October 2, 2024, Plaintiff sent dispute letters to TransUnion through Credit Beast, wherein Plaintiff disputed the Account as fraudulent. Upon receipt of Plaintiff's disputes, TransUnion forwarded same to Defendant.

39. On or about October 2, 2024, Plaintiff sent dispute letters to Equifax through Credit Beast, wherein Plaintiff disputed the Account as fraudulent. Upon receipt of Plaintiff's disputes, Equifax forwarded same to Defendant.

40. On or about October 2, 2024, Plaintiff sent dispute letters to Experian through Credit Beast, wherein Plaintiff disputed the Account as fraudulent. Upon receipt of Plaintiff's disputes, Experian forwarded same to Defendant.

41. On or about October 5, 2024, TransUnion responded to Plaintiff's dispute through the CFPB. In that response, TransUnion informed Plaintiff that it had investigated Plaintiff's disputes of the Account and Defendant had verified the Account as reported. Accordingly, the fraudulent Account continued to be reported on Plaintiff's TransUnion

credit report.

42. On or about October 29, 2024, Experian provided its response to Plaintiff's dispute to the CFPB. In its response, Experian stated it had contacted the Defendant and asked Defendant to verify the accuracy of the Account. Thereafter, Defendant verified the Account as accurate, and it continued to be reported on the Plaintiff's Experian credit report.

43. On or about December 30, 2024, Plaintiff obtained a copy of his TransUnion and Equifax credit reports. Upon reviewing each credit report, Plaintiff discovered that the Account was still reporting as belonging to Plaintiff.

44. Frustrated that his credit reports still contained inaccurate and fraudulent information, in or around January 2025, Plaintiff terminated Credit Beast's services.

45. On January 3, 2025, Defendant's employee, Andrea Aguilar, responded to Plaintiff's dispute to Equifax claiming this was a fraudulent account by verifying the Account as accurate.

46. On or about January 10, 2025, TransUnion forwarded Plaintiff Investigation Results, wherein TransUnion informed Plaintiff the Account was verified as accurate and updated by Defendant. As a result, the disputed Account remained on Plaintiff's credit report. With the Investigation Results, TransUnion also included an updated TransUnion credit report dated January 10, 2025, which confirmed that Defendant was continuing to report the fraudulent Account as belonging to Plaintiff.

47. On January 13, 2025, Defendant's employee, Lace Lewallen, responded to Plaintiff's dispute to Equifax claiming this was a fraudulent account by verifying the Account as accurate.

8

48.     On or about January 29, 2025, Plaintiff obtained a new copy of his Experian credit report which continued to report the Account as belonging to Plaintiff.

49.     On February 10, 2025, Defendant's employee, Lace Lewallen, responded to Plaintiff's dispute to Equifax claiming this was a fraudulent account by verifying the Account as accurate.

50.     On or about February 24, 2025, Plaintiff sent a new dispute letter to TransUnion. In this letter, Plaintiff again informed TransUnion that he had been the victim of identity theft, and that the Account was a fraudulent account opened in his name without his permission. Plaintiff provided his Social Security number, date of birth, and address in his letter to TransUnion. TransUnion received Plaintiff's dispute on March 13, 2025, and thereafter forwarded same to Defendant.

51.     On or about February 24, 2025, Plaintiff sent a new dispute letter to Equifax. In his letter, Plaintiff stated he had been the victim of identity theft and fraud. Plaintiff specifically disputed the Account as fraudulent and provided Equifax his full Social Security number, date of birth, and address, and requested Equifax fix his credit report so it would be correct. Equifax received Plaintiff's dispute on March 15, 2025, and thereafter forwarded same to Defendant.

52.     On or about February 24, 2025, Plaintiff sent a dispute letter to Experian again stating he had been the victim of identity theft and fraud. Plaintiff specifically identified and disputed the Account as a fraudulent account opened in his name without his permission, and provided his Social Security number, date of birth, and address to Experian. Experian received Plaintiff's dispute on March 4, 2025, and thereafter forwarded same to

9

Defendant.

53. On or about March 6, 2025, TransUnion forwarded its Investigation Results to Plaintiff and included an updated copy of Plaintiff's credit report. The fraudulent Account remained on Plaintiff's credit report.

54. On March 12, 2025, Defendant's employee, Daniel LoBiondo, responded to Plaintiff's dispute to Equifax claiming this was a fraudulent account by verifying the Account as accurate.

55. On or about March 17, 2025, Equifax forwarded Plaintiff a letter stating it had received Plaintiff's dispute concerning the Account. However, because Defendant continued to wrongfully verify the Account as accurate and Plaintiff had already disputed the Account twice within the past 90 days, Equifax considered Plaintiff's dispute frivolous and refused to investigate Plaintiff's dispute.

56. On or about March 26, 2025, Plaintiff sent another dispute letter to TransUnion. In this letter, Plaintiff stated he had received TransUnion's Investigation Results, but there were still fraudulent and incorrect accounts appearing on his credit report. Plaintiff again stated he had been the victim of identity theft and specifically disputed the Account. With his dispute, Plaintiff provided a copy of the police report he filed, his driver's license, and his Social Security card. TransUnion received Plaintiff's dispute on April 3, 2025, and thereafter forwarded same to Defendant.

57. On or about March 26, 2025, Plaintiff sent another dispute letter to Equifax. In this letter, Plaintiff again informed Equifax he had been the victim of identity theft, and that multiple fraudulent and incorrect accounts were appearing on his credit report. Plaintiff

10

specifically disputed the Account as a fraudulent account opened in his name without his permission. With this dispute letter, Plaintiff included a copy of his police report, Equifax's March 17, 2025, letter, his driver's license, and his Social Security card. Equifax received Plaintiff's dispute on April 4, 2025, and thereafter forwarded same Defendant.

58.     On or about March 28, 2025, TransUnion mailed Investigation Results to Plaintiff. In these results, TransUnion informed Plaintiff that Defendant had verified the Account as accurate. As a result, the Account continued to be reported as a derogatory account belonging to Plaintiff on Plaintiff's credit report.

59.     On or about March 28, 2025, Experian forwarded Plaintiff its Investigation Results stating the Defendant had verified and updated the Account. Experian also included an updated copy of Plaintiff's credit report, which continued to report the fraudulent Account as belonging to Plaintiff.

60.     On April 2, 2025, Defendant responded to Plaintiff's dispute to Equifax claiming this was a fraudulent account by again verifying the Account as accurate.

61.     On or about April 3, 2025, TransUnion mailed Plaintiff new Investigation Results showing that TransUnion finally deleted the fraudulent Account from Plaintiff's credit report. TransUnion also forwarded Plaintiff a copy of his credit report dated April 3, 2025, which confirmed the Account had finally been removed.

62.     Just three days later, on April 6, 2025, TransUnion forwarded Plaintiff new Investigation Results, wherein TransUnion informed Plaintiff that the Account had been reinserted onto his credit report because Defendant had again verified it as accurate. Accordingly, TransUnion reinserted the fraudulent Account back onto Plaintiff's credit

report. TransUnion also mailed Plaintiff a copy of his updated credit report dated April 6, 2025, which confirmed the fraudulent Account was again reporting on Plaintiff's credit report.

63. On or about April 8, 2025, Equifax mailed Plaintiff a letter stating that as a result of Plaintiff's dispute, the Account had been removed from Plaintiff's Equifax credit file. Subsequently, Defendant requested the Account be reinserted onto Plaintiff's Equifax credit file and submitted a certification that the Account belonged to Plaintiff and the information being reported was accurate. As a result, Equifax accepted Defendant's certification of the Account and reinserted the fraudulent Account onto Plaintiff's Equifax credit report.

64. On or about April 11, 2025, Experian forwarded Plaintiff its Investigation Results stating that Defendant had updated the Account. Experian also forwarded Plaintiff a copy of his updated credit report dated April 11, 2025. Upon review, the fraudulent Account continued to be reported as a derogatory account belonging to Plaintiff.

65. On or about May 7, 2025, Plaintiff sent a new dispute letter to TransUnion. In this letter, Plaintiff again disputed the Account as a fraudulent account opened in his name without his knowledge or permission. With his dispute letter, Plaintiff again included a copy of the police report he filed, and a copy of his driver's license. TransUnion received Plaintiff's dispute on May 14, 2025, and thereafter forwarded same to Defendant.

66. On or about May 7, 2025, Plaintiff sent a new dispute letter to Equifax, disputing the Account as having been opened in his name without his knowledge or permission. Plaintiff again included a copy of the police report he filed, and his driver's license.

12

Equifax received Plaintiff's dispute packet on May 20, 2025, and thereafter forwarded same to Defendant.

67. On or about May 7, 2025, Plaintiff sent a new dispute letter to Experian wherein he disputed the fraudulent Account. Plaintiff specifically stated he had been the victim of identity theft and that the Account had been opened in his name without his knowledge or permission. With his dispute, Plaintiff provided a copy of the police report he filed regarding the identity theft and a copy of his driver's license. Experian received Plaintiff's dispute on May 15, 2025, and thereafter forwarded same to Defendant.

68. On or about June 7, 2025, TransUnion forward Plaintiff Investigation Results showing that Defendant had again verified the Account as accurate and updated certain information.

69. On or about June 10, 2025, Experian forwarded Plaintiff its Investigation Results showing Defendant had verified and updated the Account.

70. On or about June 11, 2025, Plaintiff sent another dispute letter to Experian disputing the Account as a fraudulent account opened without his knowledge or permission. Plaintiff included another copy of his police report. Experian received Plaintiff's dispute and thereafter forwarded same to Defendant.

71. On or about July 9, 2025, Plaintiff filed another FTC Identity Theft Report wherein he listed the Account as a fraudulent account.

72. On or about July 9, 2025, Experian responded to Plaintiff's dispute by forwarding Investigation Results, showing Defendant again verified the disputed Account. As a result, the Account remained on Plaintiff's credit report.

13

73. On or about August 4, 2025, Plaintiff sent a new dispute letter to TransUnion. In this letter, Plaintiff again disputed the fraudulent Account reporting on his TransUnion credit report. With his dispute letter, Plaintiff included another copy of his police report, as well as a copy of his new FTC Identity Theft Report dated July 9, 2025. TransUnion received Plaintiff's dispute on August 15, 2025, and thereafter forwarded same to Defendant.

74. On or about August 4, 2025, Plaintiff sent a dispute letter to Experian. In this letter, Plaintiff again disputed the Account as a fraudulent account opened without his knowledge or permission. With this letter, Plaintiff again included a copy of the police report he filed, and a copy of the FTC Identify Theft Report he filed on July 9, 2025. Experian received Plaintiff's dispute letter on August 14, 2025.

75. On or about September 8, 2025, Experian forward Plaintiff Investigation Results, wherein Experian informed Plaintiff that Defendant verified the disputed Account as accurate and updated the Account information. Thus, the Account remained on his credit report.

76. On or about September 10, 2025, TransUnion forwarded Plaintiff its Investigation Results, wherein TransUnion informed Plaintiff that Defendant verified the Account as accurate and thus remained on his credit report.

77. Plaintiff is working to purchase a home for his family, but Defendant's continued refusal to remove the fraudulent Account from Plaintiff's credit report is preventing Plaintiff from being able to purchase a home.

78. To date, Defendant continues to intentionally and maliciously report the fraudulent

Account as belonging to Plaintiff to the consumer reporting agencies, which in turn provides Plaintiff's credit reports to multiple third parties including Plaintiff's creditors, potential creditors, insurance companies and others.

79. From at least January 2024, through the present, Defendant has continued to report false, libelous, inaccurate, and defamatory information regarding the Plaintiff to the national credit bureaus and to numerous third parties. While Defendant has reported the fraudulent Account as belonging to Plaintiff on his credit reports, said information was provided to and/or viewed by Navy FCU, Mission Lane, Granite Bay Acceptance Company, Progressive Insurance, Debthunch, Advantage 1st Financial, LLC, Capital One, First National Credit Card, FSB Blaze Credit Card, TAB/Mission Lane, EC Hilton Head Regional Medical Center, TD Banknorth, CPC Credit Vision, Verizon Wireless, Jewelers Mutual Insurance, First National Credit Card, GMFinancial, First Sav BankBlaze, Ally Financial, Lenders Protection, LLC, Pagaya, and others.

80. Defendant's knowing and repeated violations of the FCRA warrants an award of punitive damages. *See, e.g., Younger v. Experian Info. Sols. Inc.,* Case No. 2:15-cv-00952-SGC, at *30 (N.D. Ala. Mar. 21, 2019) (awarding punitive damages for repeated, willful violations of the FCRA).

## COUNT ONE
(Fair Credit Reporting Act)

81. The Plaintiff adopts the averments and allegations of paragraphs 12 through 80 hereinbefore as if fully set forth herein.

82. Defendant negligently violated 15 U.S.C. §1681s-2(b)(1)(A) by failing to conduct

15

an investigation after receiving notice that the Plaintiff disputed the Account information said Defendant had provided to a consumer reporting agency.

83. Defendant negligently violated 15 U.S.C. §1681s-2(b)(1)(B) by failing to review all relevant information provided by the consumer reporting agency pursuant to §1681i.

84. Defendant negligently violated 15 U.S.C. §1681s-2(b) by failing to conduct an investigation as to the accuracy of the information reported by the Defendant to the consumer reporting agencies.

85. Defendant negligently violated 15 U.S.C. §1681s-2(b)(1)(C) by reporting inaccurate, incomplete, false, and misleading results of the investigation, if any, to the consumer reporting agencies.

86. Defendant negligently violated 15 U.S.C. §1681s-2(b)(1)(D) by failing to notify all consumer reporting agencies that the reporting of the account the subject of this action was inaccurate, incomplete, false, and misleading.

87. As a result of Defendant's violations set forth above, the Plaintiff suffered damage to his credit and credit reputation, was denied credit, was forced to delay in applying for credit, and lost credit opportunities. Additionally, Plaintiff suffered humiliation, anxiety, stress, loss of sleep, anger, worry, physical sickness, headaches, mental anguish, family discord, and loss of enjoyment of life for which he seeks actual damages.  Plaintiff has also suffered damages for attorneys' fees, certified mail expenses, and other out of pocket losses.

**COUNT TWO**
(Fair Credit Reporting Act)

88. The Plaintiff adopts the averments and allegations of paragraphs 12 through 87

hereinbefore as if fully set forth herein.

89.     Defendant willfully violated 15 U.S.C. §1681s-2(b)(1)(A) by failing to conduct an investigation after receiving notice that the Plaintiff disputed the Account information Defendant had provided to a consumer reporting agency.

90.     Defendant willfully violated 15 U.S.C. §1681s-2(b)(1)(B) by failing to review all relevant information provided by the consumer reporting agency pursuant to §1681i.

91.     Defendant willfully violated 15 U.S.C. §1681s-2(b) by failing to conduct an investigation as to the accuracy of the information reported by Defendant to a consumer reporting agency.

92.     Defendant willfully violated 15 U.S.C. §1681s-2(b)(1)(C) by reporting inaccurate, incomplete, false, and misleading results of the investigation, if any, to the consumer reporting agency.

93.     Defendant willfully violated 15 U.S.C. §1681s-2(b)(1)(D) by failing to notify all consumer reporting agencies that the reporting of the account the subject of this action was inaccurate, incomplete, false, and misleading.

94.     As a result of Defendant's violations set forth above, the Plaintiff suffered damage to his credit and credit reputation, was denied credit, was forced to delay in applying for credit, and lost credit opportunities. Additionally, Plaintiff suffered humiliation, anxiety, stress, loss of sleep, anger, worry, physical sickness, headaches, mental anguish, family discord, and loss of enjoyment of life for which he seeks actual damages. Plaintiff has also suffered damages for attorneys' fees, certified mail expenses, and other out of pocket losses.

95.     As a result of Defendant's willful violations set forth above, the Plaintiff also seeks

punitive damages.

## COUNT THREE
### (Defamation, Libel, and Slander)

96. The Plaintiff adopts the averments and allegations of paragraphs 12 through 95 hereinbefore as if fully set forth herein.

97. Defendant willfully, wantonly, recklessly and/or maliciously published and communicated false and defamatory statements regarding Plaintiff to third parties and the public at large. Said statements harmed Plaintiff's reputation and caused Plaintiff physical sickness, mental anguish, and emotional distress.

98. Said communications were false in that Plaintiff was not indebted to Defendant. Plaintiff did not owe any balance on the Account the subject of this action as said Account was clearly fraudulent.

99. Said false and defamatory statements have harmed the reputation of Plaintiff and/or deterred third persons from associating with Plaintiff. Specifically, Defendant reported the Account to the consumer reporting agencies as belonging to Plaintiff so the Account would appear on Plaintiff's credit reports. Plaintiff's credit reports were viewed by numerous third parties as set out above and Plaintiff has been denied credit.

100. Defendant communicated to third parties and the public at large false information concerning Plaintiff, disseminating and imputing false and misleading credit worthiness information concerning Plaintiff, including but not limited to reporting that Plaintiff owed the Account the subject of this action.

101. At the time said communications were made, Defendant knew or should have

known the falsity of the communications or recklessly disregarded the potential inaccuracy of the information, yet knowingly, willfully, and maliciously communicated the falsity.

102. As a result of Defendant's intentional communications to third parties of the false information, Plaintiff was caused to suffer injury to his reputation in the eyes of his community and the public at large, and was forced to endure credit reporting of the fraudulent Account that was opened in his name without his knowledge or permission.

103. As a proximate consequence of said defamation, libel and slander, the Plaintiff suffered damage to his credit and credit reputation, was denied credit, had to delay is applying for credit, and lost credit opportunities. Additionally, Plaintiff suffered humiliation, anxiety, stress, loss of sleep, anger, worry, physical sickness, mental anguish, family discord, lost time, and loss of enjoyment of life, for which he Plaintiff seeks damages.

104. As Defendant's conduct was willful, Plaintiff seeks an award of punitive damages to deter similar future conduct.

## AMOUNT OF DAMAGES DEMANDED

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands a judgment against Defendant for the following:

A. Actual and statutory damages from Defendant pursuant to 15 U.S.C. §1681n(a)(1)(A) and/or 15 U.S.C. §1681o(a)(1);

B. Punitive damages from Defendant pursuant to 15 U.S.C. §1681n(a)(2);

C. Costs and reasonable attorney's fees from Defendant pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2);

D.     Actual, compensatory, and punitive damages for Defendant's violations of South Carolina common law set forth herein;

E.     For this matter to be heard by a jury; and

F.     For such other and further relief as the Court may deem just and proper.


                                             */s/ Penny Hays Cauley*
                                             Penny Hays Cauley, Fed.  ID No.  10323
                                             Attorney for Plaintiff

**OF COUNSEL:**
HAYS CAULEY, P.C.
1303 West Evans Street
Florence, SC 29501
(843) 665-1717
phc917@hayscauley.com

**PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY ON ALL COUNTS**


                                             */s/ Penny Hays Cauley*
                                             Of Counsel


**DEFENDANT TO BE SERVED VIA CERTIFIED MAIL,
RETURN RECEIPT REQUESTED AND RESTRICTED DELIVERY**:
Austin Capital Bank SSB
c/o Mark Debiasio, Bank President
3305 Steck Avenue, Suite 275
Austin, Texas 78757